**TARTER KRINSKY & DROGIN LLP**
Richard C. Schoenstein
Jonathan E. Temchin
1350 Broadway
New York, New York 10018
Tel.: (212) 216-8000
Facsimile: (212) 216-8001
Email: rschoenstein@tarterkrinsky.com
Email: jtemchin@tarterkrinsky.com

*Attorneys for Plaintiff, Holborn Corporation*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HOLBORN CORPORATION,<br><br>Plaintiff,<br><br>-against-<br><br>WEATHERLY J. RAMSDELL a/k/a WEATHERLY J. HAMMOND,<br><br>Defendant. | Civil Action No.:<br><br>**COMPLAINT** |

Plaintiff Holborn Corporation ("Plaintiff"), by and through its attorneys, Tarter Krinsky & Drogin LLP, as and for its Complaint against Defendant Weatherly J. Ramsdell a/k/a Weatherly J. Hammond ("Defendant"), alleges and states as follows:

## NATURE OF THE ACTION

1. This action seeks to stop Defendant, Plaintiff's former Vice President and Director of Marketing and Media Relations, from diverting Plaintiff's existing clients to Defendant's new employer, Willis Re, Inc. ("Willis Re"), Plaintiff's direct competitor in the reinsurance brokerage industry, and from misappropriating Plaintiff's confidential information, in direct violation of her contractual post-employment obligations to Plaintiff.

2. As set forth in greater detail below, during her time as Plaintiff's employee and as a condition of receiving substantial additional remuneration, Defendant entered into an Amended Loyalty Agreement, dated December 29, 2010 (the "Amended Loyalty Agreement"), pursuant to which Defendant agreed to certain restrictive covenants, including, among other things, not to induce or seek to influence existing clients of Plaintiff to discontinue or reduce their business relationship with Plaintiff, to solicit, accept, or facilitate the acceptance of any reinsurance broking or services business from Plaintiff's existing or target clients, or to assist or cause any person or entity to engage in any of the prohibited actions, for a period of 18 months following the termination of her employment (the "Client Restrictions"), and not to use or disclose Plaintiff's Confidential Information (as defined in the Loyalty Agreement) at any time (the "Confidentiality Provisions").

3. Defendant voluntarily resigned her employment with Plaintiff on or about August 2, 2019. In early 2020, she became employed by Willis Re (a direct competitor of Plaintiff) in the position of Senior Vice President performing the same or similar functions as she did with Plaintiff. Shortly thereafter, Plaintiff's long-standing client, New York Property Insurance Underwriting Association ("NYPIUA"), terminated its business relationship with Plaintiff, under circumstances that make it apparent that Plaintiff induced and/or influenced NYPIUA to do so, and/or solicited, accepted or facilitated the acceptance of reinsurance business from NYPIUA, and/or otherwise violated the Client Restrictions in the course of bringing NYPIUA to Willis Re and working on the engagement.

4. Defendant's breach of her contractual obligations and duties has caused Plaintiff to sustain substantial monetary damages totaling well into the millions of dollars, as well as irreparable injury that can only be addressed through injunctive relief. Defendant has violated the Client Restrictions under circumstances that demonstrate a high risk of both further violations and violations of the Confidentiality Provisions, such that Plaintiff's rights can only be protected by provisional and final injunctive relief from this Court. Plaintiff brings this action to enforce its rights under both law and equity.

## THE PARTIES

5. Plaintiff was and is a corporation duly organized and existing under the laws of the State of Delaware with a place of business located at 180 Maiden Lane, in the City of New York, New York 10038.

6. Upon information and belief, Defendant was and is a natural person residing at 79 Valley Road, Westport, Connecticut 06880.

## JURISDICTION AND VENUE

7. Defendant is subject to personal jurisdiction in this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302 because: (a) Defendant transacts substantial business in the State of New York; (b) this action arises out of conduct performed in the State of New York; and (c) Defendant in the Amended Loyalty Agreement agreed that any lawsuit between the parties concerning the Amended Loyalty Agreement and/or arising out of Defendant's employment "shall be commenced and maintained in a court of competent jurisdiction in the State of New York."

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the complete diversity of Plaintiff and Defendant and because the amount in controversy exceeds $75,000.00.

9. Venue of this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because Defendant purposefully directed her business conduct within and towards this judicial district and because a substantial part of the events at issue in this action occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### Plaintiff's Business

10. Plaintiff has been in the insurance brokerage business for one hundred years, and has become a global leader in the industry through its steadfast commitment to client development, providing exceptional services and investing incalculable resources maintaining and fostering client relationships over the long-term; indeed, strengthening long-term client relationships is a "cornerstone" of Plaintiff's "mission," as it touts on its website.

11. Plaintiff offers insurance brokerage products, tools and services to its clients, including, without limitation, reinsurance brokering services and reinsurance intermediary, actuarial and analytical services; and in connection therewith has expended substantial resources in developing and maintaining its confidential and proprietary business information. The vast majority of Plaintiff's business is in the reinsurance field.

12. The reinsurance brokerage business is dominated by three companies who collectively earn as much as $4 billion in annual revenues. On information and belief, Willis Re is one of those companies, operating internationally with more than 1,400 employees. Willis Re is owned by Willis Towers Watson, a NASDAQ-listed international insurance company with 45,000 employees. By contrast, Plaintiff is an employee-owned company with only 72 employees and offices only in the United States.

13. Plaintiff can only compete with companies like Willis Re through the dedicated performance of Plaintiff's highly skilled employees and through strategies developed over the years to enable Plaintiff to offer highly competitive reinsurance brokerage services. Thus, Plaintiff employs proprietary methodologies to assist in placing reinsurance coverage on behalf of its clients and, thereby, to enable Plaintiff to maintain a competitive position in the reinsurance field. These strategies have also allowed Plaintiff to remain an independent brokerage while similarly sized competitors have been subsumed or acquired, leading to less choice for those companies purchasing reinsurance.

14. As a core component of its business model, Plaintiff places special emphasis on employee development and growth. Towards that end, Plaintiff implemented an Employee Stock Ownership Plan ("ESOP"), by which Plaintiff's employees have effectively become the company's shareholders, thereby having a direct and meaningful stake in the company's success. Plaintiff also has a phantom stock program that rewards additional compensation to key employees who are instrumental in developing and retaining the company's clients.

**Defendant's Employment and Agreements**

15. Defendant began her employment with Plaintiff in entry-level position as a Reinsurance Analyst right after graduating from college in or around May 2000. Defendant received the full panoply of benefits extended to employees, including the right to participate in the ESOP with rights that vest over time.

16. As Defendant gained more experience, responsibility and senior-level status, Plaintiff and Defendant entered into a written Phantom Stock Award, made as of March 1, 2009 (the "2009 PSA") so that she could receive additional compensation for her services. This is a

special incentive awarded in addition to ESOP rights to certain high-level employees providing key services for Plaintiff.

17. Under the 2009 PSA, Defendant received certain phantom stock rights with respect to shares of Series B Common Stock of the company, which after vesting would be payable to Defendant upon the happening of enumerated events, one of which being the termination of her employment with the company.

18. Simultaneous with her execution of the 2009 PSA, Defendant and Plaintiff entered into a Loyalty Agreement, made as of March 1, 2009 (the "Original Loyalty Agreement"), which sets forth certain restrictive covenants and prohibits against Defendant's use of confidential information following the termination of her employment.

19. The Original Loyalty Agreement further provides, among other things, that "in connection with the grant of phantom stock to Employee [Defendant] under the Phantom Stock Award dated March 1, 2009, which Employee [Defendant] recognizes may have very substantial value to him/her, Employee [Defendant] has agreed to enter into this loyalty agreement."

20. Plaintiff and Defendant entered into an Amendment to Phantom Stock Award Agreement, signed and dated by Defendant on December 29, 2010 (the "PSA Amendment"), amending certain provisions of the 2009 PSA.

21. Simultaneous with her execution of the PSA Amendment, Defendant signed the Amended Loyalty Agreement, wherein Defendant once again acknowledged that the 2009 PSA provide her with "very substantial financial value."

22. Section 2 of the Amended Loyalty Agreement sets forth strict obligations upon Defendant to maintain and not to misuse Plaintiff's Confidential Information (the "Confidentiality Provisions"); specifically, Section 2(a) of the Amended Loyalty Agreement provides:

> Employee acknowledges that in connection with his/her employment by the Company, Employee has acquired (and will continue to acquire) and has made use of (and will continue to make use of) confidential information and trade secrets ("Confidential Information") belonging to the Company including but not limited to the Company's business, financial statements, internal memoranda, reports, customer lists, customer information, financial analyses, risk and actuarial analyses, plans, proposals, work product, and other materials and records not widely known in the industry. In order for the Company to protect its Confidential Information, **Employee agrees that he/she will not, directly or indirectly, during his/her employment by the Company and thereafter for so long as any such Confidential Information shall remain confidential, use such Confidential Information or disclose, transmit, divulge, or disseminate to anyone any Confidential Information, except in connection with and in furtherance of his/her diligent and faithful performance of Employee's duties as an employee** of the Company or (to the extent applicable) as an officer or director of the Company.

(emphasis added.)

23. Section 2(c) of the Amended Loyalty Agreement sets forth the definition of Confidential Information as:

> The term "Confidential Information" in this Agreement is intended to be construed in its broadest possible meaning, and includes all such information in any and all forms, whether written, oral, or electronic, on a computer, tape, chip, disk, drive, card, memory device, or in any other form, whether prepared by Employee, by the Company, or by others, and includes all originals, summaries, portions, and copies of any and all such information. All Confidential Information is and remains the exclusive property of the Company, including all work product and working papers prepared by Employee or other Company employees.

24. Defendant was privy to Confidential Information during her employment with Plaintiff. Among other things, she was fully familiar with the proprietary methodologies developed by Plaintiff to place reinsurance coverage for its clients, the identity of those clients and the specifics of their reinsurance programs, the cost of reinsurance placed for Plaintiff's clients, including the identities of Plaintiff's employees assigned to service each client account, and the compensation structure for Plaintiff's brokers and other employees, all of which is highly confidential and maintained in secrecy by Plaintiff. The disclosure of such information to

Plaintiff's competitors – especially a large competitor like Willis Re – would seriously jeopardize Plaintiff's competitive position in the reinsurance field.

25. Section 5 of the Amended Loyalty Agreement sets forth restrictions on Defendant's ability to solicit and divert Plaintiff's existing and prospective clients for a period of 18 months following the termination of her employment (the "Client Restrictions"), providing in Section 5(a):

> Except as otherwise provided in subsection (c) below, Employee agrees that during his/her employment by the Company and for a period of eighteen (18) months after his/her employment terminates with the Company for any reason, whether voluntarily or involuntarily, **Employee will not, directly or indirectly: (i) induce or seek to influence any "Existing Clients" of the Company to discontinue or reduce their business relationship with the Company, except if directed in writing to do so by the Chief Operating Officer of the Company, (ii) solicit, accept, or facilitate the acceptance of any reinsurance broking or services business from any "Existing Clients" or "Target Clients" of the Company, except for the exclusive benefit of the Company, or (c) assist or cause any person or entity to engage in any of the actions in which Employee has agreed not to engage under this section.**

(emphasis added.)

26. Section 5(b) defines "Existing Clients" as "customers of the Company with whom Employee personally engaged in business dealings or had a business relationship while at the Company within eighteen (18) months immediately prior to his/her termination of employment," which plainly includes NYPIUA.

27. Pursuant to Section 9 of the Amended Loyalty Agreement, Defendant acknowledges and agrees that the restrictive covenants set forth in Section 5, including the Client Restrictions, "are reasonable as to time, scope and the area covered" and "necessary to protect the legitimate business interests of the Company, not against the public interest, and do not place an unreasonable burden on the Employee."

28. Section 7(a) of the Amended Loyalty Agreement requires Defendant to notify her new employers of the restrictive covenants set forth in the Amended Loyalty Agreement for 18 months after the termination of her employment with Plaintiff, providing:

> Should Employee seek employment with or seek to provide services to another employer or person during his/her employment with the Company or within eighteen (18) months thereafter, **Employee agrees to disclose to his/her prospective new employer, prior to accepting an oral or written offer of employment, the obligations and restrictions described in sections 1 through 6 of this Agreement** as they relate to Confidential Information, return of all Company property, limited period of non-competition, limited restrictions regarding Company customers, and no solicitation or employment of Company employees.

(emphasis added.)

29. Pursuant to Section 7(b) of the Amended Loyalty Agreement, Defendant is required to notify Plaintiff of any new employment in the reinsurance brokerage business for 18 months after the termination of her employment with Plaintiff, providing:

> Employee agrees that, during his/her employment and for eighteen (18) months after termination of Employee's employment for any reason, Employee shall immediately notify the Chief Operating Officer of the Company in writing of the name and address of **(i) any and all employers with whom he/she has accepted employment (whether orally or in writing) in the reinsurance or reinsurance brokerage business, and (ii) the name and address of any and all other companies or persons in the reinsurance or reinsurance brokerage business with whom Employee has been retained (whether orally or in writing) as an employee, officer, director, agent, consultant, independent contractor, or in any other similar role).** Employee acknowledges that the Company may advise any such new employer or any such company or person of the existence and terms of Employee's obligations and restrictions under this Agreement, and Employee hereby authorizes the Company to do so.

(emphasis added.)

30. Under Section 8(a) of the Amended Loyalty Agreement, Defendant acknowledges that her breach of the restrictive covenants could result in irreparable harm to the company and

authorizes Plaintiff to seek appropriate injunctive relief without the posting of a bond or other security, providing:

> **In the event of a breach or threatened breach of any of the sections of this Agreement, it is understood that the Company shall be entitled to seek from a court a temporary restraining order, preliminary injunction, permanent injunction, and/or any other form of equitable relief (without the requirement of posting a bond or other security).** These rights and remedies shall be in addition to any other legal, equitable, and contractual rights and remedies, including but not limited to (i) those set forth in subsections (b) and (c) below, and (ii) compensatory and punitive damages against the Employee, for any breach or threatened breach of any of the sections of this Agreement or for any violation of the Company's rights or the Employee's duties or obligations to the Company or for any violation of law.

(emphasis added.)

31. Pursuant to Section 8(b) of the Amended Loyalty Agreement, in the event of Defendant’s material breach of the confidentiality and non-solicitation restrictions, Plaintiff may elect to the treat the Amended Loyalty Agreement, the 2009 PSA and the PSA Amendment “as null and void” and has “no obligation not make any payment” thereunder.

32. Paragraph 8(c) of the Amended Loyalty Agreement provides, in relevant part, that “in any judicial proceeding brought by the Company for a breach of threatened breach of this Agreement, the prevailing party shall also be entitled to be reimbursed by the other party for its reasonable attorneys’ fees, expenses, and costs.”

33. In early 2014, Plaintiff extended additional incentive benefits in the form of stock appreciation rights to Defendant; and accordingly, Plaintiff and Defendant entered into a written Stock Appreciation Rights Grant, entered into as of March 1, 2014 (the “2014 SAR”), pursuant to which Plaintiff granted to Defendant certain shares of common stock of the company at a base price that vest over time.

34. In early 2015, Plaintiff once again extended additional incentive benefits to Defendant in the form of stock appreciation rights; and accordingly, Plaintiff and Defendant

entered into a written Stock Appreciation Rights Grant, entered into as of March 1, 2015 (the "2015 SAR"), pursuant to which Plaintiff granted to Defendant certain shares of common stock of the company at a base price that vest over time.

35. Plaintiff and Defendant entered into a Mutual Consent to Cancellation of Stock Appreciation Rights Awards and Issuance of New Awards, dated December 14, 2017 (the "Mutual Consent"), pursuant to which Plaintiff cancelled the SARs and issued New Awards to Defendant under terms more favorable to Defendant.

36. The Mutual Consent states, among other things, that "[i]n consideration of the issuance of the New Award, the Participant [Defendant] agrees to reaffirm the terms of the Loyalty and the any Amended Loyalty Agreements."

37. Paragraph 5 of the Mutual Consent states that Defendant "acknowledges that, as part of the consideration for the New Awards, he/she is or will be entering into a Re-Affirmation of Loyalty/Amended Loyalty Agreement … contemporaneously with the issuance of the New Award."

38. Simultaneously with her execution of the Mutual Consent, Defendant entered into a Re-Affirmation of Loyalty/Amended Loyalty Agreement(s), made December 14, 2017 (the "Reaffirmation").

39. Paragraph 1 of the Reaffirmation provides that Defendant "hereby re-affirms the terms and conditions of any and all such Loyalty Agreements and Amended Loyalty Agreements he/she has agreed to and re-affirmed, including [the Original Loyalty Agreement and the Amended Loyalty Agreement], and commits to honor same."

40. Paragraph 2 of the Reaffirmation states that Plaintiff "accepts such re-affirmation by Employee as consideration for the issuance of such new Stock Appreciation Rights Grant(s)" as set forth in the Mutual Consent.

41. As Plaintiff heaped compensation, benefits, promotions in title and additional responsibilities upon Defendant, Defendant eventually was given primary client management and interfacing responsibility with many of Plaintiff's long-term and most valuable accounts, including NYPIUA, who was an important client for many years prior.

**Defendant's Departure**

42. Defendant voluntarily resigned her employment with Plaintiff on or about August 2, 2019, and Plaintiff continued to service NYPIUA's account as it had in the past.

43. At the time, Defendant represented that she was leaving to work as an underwriter at an insurance company, and not as a reinsurance broker, therefore in a capacity that would not compete in any way with the business of Plaintiff and would not have put her in a position to seek business from the clients of Plaintiff.

44. In connection with her departure, Defendant received substantial compensation and benefits, including, without limitation: (a) the immediate vesting of Stock Appreciation Rights payments under the New Awards in the amount of $85,680.00; (b) annual installment payments of $9,568.75 over a five year term for a total amount of $47,843.75 pursuant to a Synthetic Equity Promissory Note, reflecting payments for the phantom stock that she acquired under the 2009 PSA and PSA Amendment, the first installment of which has already been paid; (c) a rollover of $1,069,530.55 under Defendant's ESOP to a new retirement account of her choosing; and (d) payment of an additional bonus of $7,500.00.

**Defendant's Misconduct**

45. On information and belief, in early 2020, and without any notice to Plaintiff, Defendant accepted the position of Senior Vice President with Willis Re.

46. Willis Re is a direct competitor of Plaintiff in the reinsurance brokerage industry, offering virtually identical products, tools and services as Plaintiff, and servicing the same or similar clientele in the same geographical regions as Plaintiff, including, without limitation, the State and City of New York.

47. As a Senior Vice President with Willis Re, Defendant's job responsibilities almost certainly include acting as a lead client-facing representative on behalf of the company, which is the role she held with Plaintiff immediately prior to the termination of her employment.

48. Upon information and belief, Defendant breached Section 7(a) of the Amended Loyalty Agreement by failing to provide Willis Re with the requisite notice of the restrictive covenants prior to her accepting Willis Re's offer of employment.

49. In commencing employment with Willis Re, Defendant breached Section 7(b) of the Amended Loyalty Agreement by failing to notify Plaintiff in writing of "the name and address of any and all other companies or persons in the reinsurance or reinsurance brokerage business with whom [Defendant] has been retained."

50. On May 19, 2020, Plaintiff was notified by NYPIUA that NYPIUA is terminating its relationship with Plaintiff after many years of dedicated service, exemplary results and substantial revenue earned by Plaintiff, and would immediately be moving its business to Willis Re. The termination of NYPIUA's relationship with Plaintiff was disclosed in a phone call from NYPIUA's President, who initially informed Plaintiff's CEO that NYPIUA was "moving its business to Weatherly." Plaintiff's CEO immediately raised the issue of the Client Restrictions,

upon which NYPIUA's President changed his tune, stating that NYPIUA was "going to Willis." NYPIUA's President spoke later the same day with Plaintiff's President, again making comments suggesting that Defendant had been involved in the decision to move the business from Plaintiff to Willis Re, and offered thin justifications for the sudden move after 14 years of doing business with Plaintiff.

51. The timing of the move, the comments of NYPIUA's President and the manner in which Willis Re undertook to transition the account all demonstrate that Defendant must have been involved in moving the account. Any such involvement was in direct violation of the Client Restrictions in the Amended Loyalty Agreement, because Defendant induced and/or influenced NYPIUA to terminate its relationship with Plaintiff, and/or solicited, accepted or facilitated the acceptance of NYPIUA's business at Willis Re, and/or assisted Willis Re in moving the NYPIUA account away from Plaintiff.

52. Because it is apparent that Defendant was involved in poaching the NYPIUA account, in violation of her contractual obligations, Plaintiff could only assume that she also used and/or disclosed Confidential Information in violation of the Confidentiality Provisions. The disclosure to Willis Re of items such as the proprietary methodologies developed by Plaintiff to place reinsurance coverage for its clients, the identity of those clients and the specifics of their reinsurance programs, the cost of reinsurance placed for Plaintiff's clients, including the identities of Plaintiff's employees assigned to service each client account, or the compensation structure for Plaintiff's brokers and other employees, would enable Defendant and Willis Re to unfairly compete for business with Plaintiff and would cause extensive and irreversible damage to Plaintiff's business prospects.

53. As a direct consequence of Defendant's breaches of the Amended Loyalty Agreement, Plaintiff has suffered, and continues to suffer irreparable harm. The loss of a major client like NYPIUA is devastating for Plaintiff and its employees – who share in the profits and losses of Plaintiff and are therefore directly impacted by such a loss in revenues – and the long-term threat posed by additional client losses and the illicit use and disclosure of Confidential Information is a matter of great concern and urgency.

54. Accordingly, by this action, Plaintiff seeks to enforce the Amended Loyalty Agreement, by restraining and enjoining Defendant from further actions contrary to the Client Restrictions, both with respect to Willis Re and as they may pertain to other Existing Clients or Target Clients, or from using or disclosing Plaintiff's Confidential Information. Plaintiff also seeks to recover appropriate compensatory and punitive damages arising from Defendant's egregious, willful and deceitful conduct, as well as the reimbursement of Plaintiff's reasonable attorneys' fees, expenses and costs under Section 8(c) of the Amended Loyalty Agreement.

**COUNT I**
**(Breach of Amended Loyalty Agreement)**

55. Plaintiff restates and realleges each and every allegation in the foregoing paragraphs as if the same were set forth herein.

56. The Amended Loyalty Agreement constitutes a valid and binding contract upon Plaintiff and Defendant.

57. Plaintiff has fully performed its obligations under the Amended Loyalty Agreement.

58. As set forth above, the Amended Loyalty Agreement sets forth certain restrictive covenants regarding the use of Plaintiff's Confidential Information and Plaintiff's existing and prospective clients.

59. Defendant's obligations under the Amended Loyalty Agreement are not overly broad, nor are they the result of duress or coercion; indeed, Defendant acknowledged and agreed in Section 9 that the restrictive covenants are "reasonable as to time, scope, and the area covered, not against the public interest, and do not place an unreasonable burden" on Defendant.

60. To the extent that Defendant's obligations under the Amended Loyalty Agreement are deemed to be overly broad, Plaintiff is entitled to "blue penciling" of the Amended Loyalty Agreement to preserve Defendant's essential obligations.

61. All conditions required by the Amended Loyalty Agreement for Defendant's performance have occurred.

62. Defendant materially breached Sections 2(a) and 5(a) of the Amended Loyalty Agreement (the Confidentiality Provisions and the Client Restrictions) by using or disclosing Plaintiff's Confidential Information and by, directly or indirectly: (a) inducing or seeking to influence Plaintiff's Existing Clients, including NYPIUA, to discontinue or reduce their business relationship with Plaintiff; (ii) soliciting, accepting or facilitating the acceptance of reinsurance broker or services business from Plaintiff's Existing Clients, including NYPIUA, and Target Clients; and/or (iii) assisting or causing any person or entity to engage in any of the foregoing actions, including Willis Re.

63. Upon information and belief, Defendant materially breached Section 7(a) of the Amended Loyalty Agreement by failing to provide Willis Re with the requisite notice of the restrictive covenants prior to her accepting Willis Re's offer of employment.

64. Defendant materially breached Section 7(b) of the Amended Loyalty Agreement by failing to notify Plaintiff in writing of "the name and address of any and all other companies or

persons in the reinsurance or reinsurance brokerage business with whom [Defendant] has been retained."

65. Defendant's actions as aforesaid were committed knowingly, willfully and in conscious disregard of Plaintiff's rights.

66. The full extent of Defendant's breach of the Amended Loyalty Agreement is not known to Plaintiff at this time. Discovery is necessary to unveil the degree to which Defendant has breached the Amended Loyalty Agreement.

67. As a direct and proximate result of Defendant's breach of the Amended Loyalty Agreement, Plaintiff has suffered direct financial and other business injury, and it will continue to suffer such harm unless Defendant is enjoined and restrained by this Court.

**COUNT II**
**(Tortious Interference)**

68. Plaintiff restates and realleges each and every allegation in the foregoing paragraphs as if the same were set forth herein.

69. Plaintiff has profitable business relationships with its clients. Defendant has direct knowledge of the existence of those relationships and that, in order to retain and further cultivate those relationships, Plaintiff must be able to continue to provide value-adding services.

70. As set forth above, Defendant has intentionally and tortiously interfered with those relationships, including, without limitation, Plaintiff's business relationship with NYPIUA.

71. As a direct and proximate result of Defendant's breach of the Amended Loyalty Agreement, Plaintiff has suffered direct financial and other business injury, and it will continue to suffer such harm unless Defendant is enjoined and restrained by this Court.

**COUNT III**
**(Misappropriation of Confidential Information)**

72. Plaintiff restates and realleges each and every allegation in the foregoing paragraphs as if the same were set forth herein.

73. Plaintiff has attempted to prevent disclosure of its Confidential Information.

74. Nevertheless, Defendant has knowingly and willfully misappropriated and is exploiting for her own competitive and economic advantage (personally or on behalf of Willis Re), Confidential Information of Plaintiff, including, but not limited to, information concerning Plaintiff's business strategies, risk and actuarial analyses, client profiles and other materials and records not widely known in the industry to which Defendant gained access solely through her engagement and employment at Plaintiff.

75. Given her willingness to be involved in inducing, influencing, soliciting, accepting, facilitating and/or assisting the transfer of accounts from Plaintiff to her new employer, it is inevitable that Defendant has used and disclosed, or will use and disclose, the misappropriated Confidential Information in the course of her new role with Willis Re while competing against Plaintiff for prospective clients and/or trying to poach Plaintiff's existing clients.

76. Defendant's actions as aforesaid were committed knowingly, willfully and in conscious disregard of Plaintiff's rights.

77. As a direct and proximate result of Defendant's breach of the Amended Loyalty Agreement, Plaintiff has suffered direct financial and other business injury, and it will continue to suffer such harm unless Defendant is enjoined and restrained by this Court.

**COUNT IV**
**(Unfair Competition)**

78. Plaintiff restates and realleges each and every allegation in the foregoing paragraphs as if the same were set forth herein.

79. Plaintiff's Confidential Information has been accumulated through great labor and expense.

80. Plaintiff's Confidential Information is both a benefit to, and property of, Plaintiff solely

81. Defendant has no rights in Plaintiff's Confidential Information and is misappropriating same for her commercial advantage over Plaintiff.

82. As a direct and proximate result of Defendant's breach of the Amended Loyalty Agreement, Plaintiff has suffered direct financial and other business injury, and it will continue to suffer such harm unless Defendant is enjoined and restrained by this Court.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. For injunctive relief temporarily, preliminarily and/or permanently enjoining Defendant from, directly or indirectly: (a) inducing or seeking to influence any current or prospective client of Plaintiff with whom Defendant worked or had contact with during the term of her employment to discontinue or reduce their business relationship with Plaintiff; (b) soliciting, accepting or facilitating the acceptance of any reinsurance broking or services business from any current or prospective client of Plaintiff with whom Defendant worked or had contact with during the term of her employment; and (c) assisting or causing any person or entity, including, without limitation, Willis Re Inc., to engage in the actions

identified in above, for 18 months following the issuance of such permanent injunctive relief (as an appropriate toll of the Client Restrictions based on Defendant's breach);

B. For injunctive relief temporarily, preliminarily and/or permanently enjoining Defendant from, directly or indirectly, using, disclosing, transmitting, divulging and/or disseminating Plaintiff's Confidential Information to any person or entity, including, without limitation, Willis Re;

C. An award compensatory damages in an amount to be determined at trial;

D. An award of punitive damages in an amount to be determined at trial;

E. An award of costs and disbursements of this action, including Plaintiff's reasonable attorneys' fees, pursuant to Section 8(c) of the Amended Loyalty Agreement;

F. An award of pre and post judgment interest; and

G. Such other and further relief as this Court deems just and proper.

Dated: New York, New York
May 26, 2020

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiff, Holborn Corporation*

By: ______________________________
Richard C. Schoenstein
Jonathan E. Temchin
1350 Broadway
New York, New York 10018
Tel.: (212) 216-8000
Facsimile: (212) 216-8001
Email: rschoenstein@tarterkrinsky.com
Email: jtemchin@tarterkrinsky.com